## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTIRCT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| **CHRISTOPHER JOHNSON, on behalf of the University of Tampa Defined Contribution Plan, individually and as a representative of a class of participants and beneficiaries,** | |
| **Plaintiff,** | **CASE NO.:** |
| **vs.** | |
| **UNIVERSITY OF TAMPA,** | |
| **Defendant.** | |

## CLASS ACTION COMPLAINT

On behalf of the University of Tampa Defined Contribution Plan ("Plan"), Plaintiff Christopher Johnson ("Plaintiff") files this Class Action Complaint against Defendant, University of Tampa ("University" or "Defendant"), for breaching its fiduciary duties in violation of the Employee Retirement Income Security Act, 29 U.S.C. §§1001–1461 ("ERISA").

## BRIEF OVERVIEW

1.     This action seeks to protect the retirement savings of more than 1,400 University of Tampa employees who are participants in the University's retirement Plan. The University has a fiduciary duty to ensure that its retirement Plan does not charge excessive fees to Plan participants. But over the past six years, Plan participants have paid at least an estimated $3 million in administrative fees. The

fees are more than 10 times what they should be. The fees are grossly excessive. And Plan participants will continue to pay grossly excessive fees unless this action moves forward.

2.      All retirement plans require administrative services. The University contracted with TIAA-CREF ("TIAA") to provide administrative services for the Plan. TIAA pockets the bulk of the excessive fees. The reason why TIAA has been able to extract such grossly excessive fees is because TIAA's fees are tethered not to any actual services it provides to the Plan; but rather, to a percentage of assets in the Plan. As the assets in the plan increase, so too increases the administrative fees that TIAA pockets from the Plan and its participants. One commentator likened this fee arrangement to hiring a plumber to fix a leaky gasket but paying the plumber not on actual work provided but based on the amount of water that flows through the pipe.

3.      Notably, it took Defendant nearly <u>fourteen years</u> to finally obtain a recordkeeping deal from TIAA that actually identified exactly what the Plan and its participants were being charged. To be sure, from 2006 through mid-2020 the TIAA recordkeeping agreement lacked any specifics as to amounts charged for recordkeeping services performed by TIAA for the Plan.  TIAA's fees skyrocketed during this period. And the University breached its ERISA's duties by failing to ensure that TIAA's fees were not excessive fees.

4.     This action is similar (but narrower in scope) to roughly twenty (20) separate lawsuits filed in federal district courts around the country.[1] In each of these other lawsuits, like here, plaintiffs allege a university defendant breached ERISA fiduciary duties by allowing TIAA to collect excessive administrative fees from the university's retirement plan. It appears, TIAA exploited its rich heritage of being a non-profit low-cost financial service provider and duped universities into excessive fee arrangements. But now university plan participants are fighting back and demanding that TIAA's fees be reduced. It appears TIAA is willing to meaningfully reduce its fees if universities will just ask. By way of example, shortly after the University of Chicago was sued it announced to its plan participants that it renegotiated TIAA's administrative fees, and that it successfully reduced fees on an annual basis by several million dollars.

5.     Many of the university who were sued in the similar lawsuits settled the claims against them on a class wide basis and lowered plan fees in the process,

---

[1] *See Sweda v. Univ. of Pa.*, 2017 WL 4179752 (E.D. Pa. Sept. 21, 2017), appeal docketed, No. 17- 3244 (3d Cir. Oct. 13, 2017); *Short v. Brown Univ.*, No. 17-cv-318 (D.R.I. filed July 6, 2017); *Cates v. Trs. of Columbia Univ. in the City of N.Y.*, No. 16-cv-6524 (S.D.N.Y. filed Aug. 28, 2016); *Cunningham v. Cornell Univ.*, No. 16-cv-6525 (S.D.N.Y. filed Aug. 17, 2016); *Clark v. Duke Univ.*, No. 16-cv-1044 (M.D.N.C. filed Aug. 10, 2016); *Henderson v. Emory Univ.*, No. 16-cv-2920 (N.D. Ga. filed Aug. 11, 2016); *Stanley v. George Washington Univ.*, No. 18-cv-878 (D.D.C. filed Apr. 13, 2018); *Kelly v. Johns Hopkins Univ.*, No. 16-cv-2835 (D. Md. filed Aug. 11, 2016); *Divane v. Northwestern Univ.*, No. 16-cv- 8157 (N.D. Ill. filed Aug. 17, 2016); *Sacerdote v. N.Y. Univ.*, No. 16-cv-6284 (S.D.N.Y. filed Aug. 9, 2016); *Nicolas v. Trs. of Princeton Univ.*, No. 17-cv-3695 (D.N.J. filed May 23, 2017); *Daugherty v. Univ. of Chi.*, No. 17-cv-3736 (N.D. Ill. filed May 18, 2017); *Munro v. Univ. of S. Cal.*, No. 16-cv-6191 (S.D. Cal. filed Aug. 17, 2016); *Cassell v. Vanderbilt Univ.*, No. 16-cv-2086 (M.D. Tenn. filed Aug. 10, 2016); *Davis v. Wash. Univ. in St. Louis*, No. 17-cv-1641 (E.D. Mo. filed June 8, 2017); *Vellali v. Yale Univ.*, No. 16-cv-1345 (D. Conn. filed Aug. 9, 2016); *Wilcox v. Georgetown Univ.*, 18-cv-00422 (D.C.C. filed Feb. 23, 2018); *Santiago v. Univ. of Miami*, 20-cv-21784-DPG (S.D. FL. April, 29, 2020).

including the following universities: $18.1 million at Massachusetts Institute of Technology, $17 million at Emory University, $14.5 million at Vanderbilt University, $14 million at Johns Hopkins University, $3.5 million at Brown University, $6.5 million at the University of Chicago, $10.65 million at Duke University, $5.8 million at Princeton University, and $13 million at University of Pennsylvania. These similar lawsuits and the class wide settlements have reduced administrative fees in similar plans and added millions to the retirement savings of hard-working university employees.

6.      The ERISA fiduciary duty of prudence is among "the highest known to the law" and requires fiduciaries to have "an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n.8 (2d Cir. 1982). As a fiduciary to the plan, the University is obligated to act for the exclusive benefit of plan and its participants, and to ensure that the plan's expenses are reasonable.

7.      The marketplace for retirement plan administrative services is established and competitive, and because the plan here has more than $4.2 billion in assets, the plan has tremendous bargaining power to demand low-cost administrative services.

8.      But instead of leveraging the plan's tremendous bargaining power to benefit plan participants, the University has failed to adequately take proper measures to understand the real cost to plan participants for administrative

services and most importantly, to act prudently with such information. As a result, plan participants pay excessive fees for administrative services.

9.      Plaintiff, individually and as a representative of participants in the University retirement Plan, bring this action on behalf of the Plan under 29 U.S.C. §1132(a)(2) and (3) to enforce liability under 29 U.S.C. §1109(a) and to restore to the Plan all losses resulting from each breach of fiduciary duty.

## JURISDICTION, VENUE, AND STANDING

10.     This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2) and (3).

11.     This judicial District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district in which the Plan is administered, where at least one of the alleged breaches took place, and where the Defendant resides.

12.     In terms of standing, §1132(a)(2) allows recovery only for a plan and does not provide a remedy for individual injuries distinct from plan injuries.

13.     Here the Plan suffered hundreds of thousands of dollars in losses caused by Defendant's fiduciary breaches, if not more.

14.     The Plan continues suffering economic losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiff and the Plan.

15.     Plaintiff has suffered such multiple concrete injuries sufficient to confer Article III standing. An action under §1132(a)(2) allows recovery only for a

plan, and does not provide a remedy for individual injuries distinct from plan injuries. *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 256 (2008). The plan is the victim of any fiduciary breach and the recipient of any recovery. *Id.* at 254. Section 1132(a)(2) authorizes any participant to sue derivatively as a representative of the plan to seek relief on behalf of the plan. 29 U.S.C. §1132(a)(2). As explained in detail below, the Plan suffered millions of dollars in losses caused by Defendant's fiduciary breaches and it remains exposed to harm and continued losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiff. To the extent the Plaintiff must also show an individual injury even though §1132(a)(2) does not provide redress for individual injuries, Plaintiff has suffered such an injury because she paid excessive administrative fees, which would not have been incurred had Defendant discharged its fiduciary duties to the Plan. Specifically, during the relevant time period, Plaintiff paid over $400 per year in administrative fees, when the reasonable amount of such a fee is roughly $35 per year.

## THE PLAN

16.     The Plan is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. §1002(2)(A) and §1002(34).

17.     The Plan is established and maintained under written documents in accordance with 29 U.S.C. §1102(a)(1).

18.     The Plan is organized under section 403(b) of the Internal Revenue Code. A 403(b) plan is a tax-deferred retirement plan, similar to a 401(k) plan. Plans offered by corporate employers are commonly referred to as 401(k) plans.

Tax-exempt organizations, public schools (including universities), and churches are eligible to offer plans qualified under 403(b), commonly known as 403(b) plans. 26 U.S.C. §403(b)(1)(A). The law allows tax-exempt organizations to be exempt from certain administrative processes that apply to 401(k) plans. In other words, administrative costs for 403(b) plans are typically lower than for 401(k) plans. This allows organizations with very small budgets to help their employees save for retirement.

19.     403(b) plans are subject to ERISA and its fiduciary requirements, unless the plan satisfies a safe harbor regulation based on the employee having limited involvement in operating the plan. Here, the Plan does not qualify for the safe harbor and is thus subject to ERISA because the University is actively involved in operating the Plan.

20.     Eligible faculty and staff members of the University are able to participate in the Plan. The Plan provides the primary source of retirement income for many University employees.   The ultimate retirement benefit provided to participants depends on the performance of investment options chosen for the Plan by the University net of fees and expenses. Participants have the right to direct the investment of their accounts among the available investment choices.

21.     The Plan had nearly $160 million in assets as of 2019. There were 1,406 participants with account balances in the Plan at the end of the 2019 reporting year.

## THE PARTIES

22.     Plaintiff is a former employee of the University of Tampa, but current participant in the Plan.

23.     Plaintiff resides in Tampa, Florida. He is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan. In fact, as of the date this Complaint was filed, he is still a participant in the Plan. Thus, every day that passes he continues to incur economic damages as a result of Defendant's violations of ERISA.

24.     Plaintiff and all participants in the Plan suffered financial harm as a result of the imprudent or excessive-fee options in the Plan because Defendant's inclusion of those options deprived participants of the opportunity to grow their retirement savings by investing in prudent options with reasonable fees.

25.     Plaintiff and all participants in the Plan suffered further economic harm as a result of paying excessive recordkeeping fees to the Plan's record-keeper.

26.     The University of Tampa is a private, not-for-profit, nonsectarian institution of higher learning with its principal place of business in Tampa, Florida.

27.     The University is the Plan sponsor under 29 U.S.C. §1002(16)(A)(i), and upon information and belief, has exclusive responsibility and complete discretionary authority to control the operation, management and administration of the Plan, with all powers necessary to enable it properly to carry out such responsibilities, including the selection and compensation of the providers of administrative services to the Plan.

28.     The University is a fiduciary to the Plan because it exercised discretionary authority or discretionary control respecting the management of the Plan or exercised authority or control respecting the management or disposition of its assets and has discretionary authority or discretionary responsibility in the administration of the Plan. 29 U.S.C. §1002(21)(A)(i) and (iii).

## FACTS APPLICABLE TO ALL COUNTS
### 403(B) PLAN FEES

29.     While everyone who participates in a 403(b) plan pays fees to the plan provider to maintain their account, industry insiders report that over 70 percent of people do not believe they pay any fees to their plan provider. In an effort to help the public obtain a better grasp on fees they pay in retirement plans, the Department of Labor passed regulations in 2012 that require plan administrators to disclose fee and expense information to plan participants. However, most plan participants are still in the dark concerning the actual amount of fees they pay. The lack of understanding is not surprising. Often fees are hidden from plain view. In many cases, plan providers do not make the fee and expense disclosures that the Department of Labor requires.

30.     By way of example, the quarterly account statements that the University provides to its Plan participants do not disclose any administrative fees paid to TIAA by its participants. In addition, the Plan's annual Form 5500 Department of Labor disclosures are supposed to identify the administrative fees paid to TIAA, but they do not clearly identify this information either. The Plan's

Form 5500 identifies TIAA as receiving "indirect compensation" (which is how TIAA collects its excessive fees from Plan participants as discussed below) but states the amount TIAA received is "0" or ""none." That is false. TIAA's indirect compensation should be clearly disclosed in the Plan's Form 5500s, but it is not.

31.     The plan's fiduciaries have control over plan fees. The fiduciaries are responsible for hiring administrative service providers for the plan and for negotiating and approving the amount of fees paid to those administrative service providers. These fiduciary decisions have the potential to dramatically affect the amount of money that participants are able to save for retirement. According to the U.S. Department of Labor, a 1% difference in fees over the course of a 35 year career makes a difference of 28% in savings at retirement. U.S. Dep't of Labor, A Look at 401(k) Plan Fees, at 1–2 (Aug. 2013).

32.     As reflected in the chart below, if a person placed $25,000 in a retirement account, made no other contributions to the account for 35 years, averaged a 7% return for 35 years, and paid .5% in fees, the account balance will grow to $227,000. But if the fees are increased by just 1%, the 1% increase costs a staggering $64,000, or 28% of the retirement savings.





33.     Accordingly, fiduciaries must engage in a rigorous process to control fees and ensure that participants pay no more than a reasonable level of fees. This is particularly true for hundred million-dollar plans like the Plan here, which has the bargaining power to obtain the highest level of service and the lowest fees. The fees available to hundred million-dollar retirement plans are orders of magnitude lower than the much higher retail fees available to small investors.

34.     The entities that provide administrative services to retirement plans have a strong incentive to maximize their fees. For each additional dollar in fees paid to a service provider, participants' retirement savings are directly reduced by

the same amount, and participants lose the potential for those lost assets to grow over the remainder of their careers. Accordingly, participants' retirement security is directly affected by the diligence used by plan fiduciaries to control, negotiate, monitor, and reduce the plan's fees.

35.     Fiduciaries must be cognizant of service providers' self-interest in maximizing fees, and not simply accede to the providers' demands, or agree to the providers' administrative fee quotes without negotiating or considering alternatives. In order to act in the exclusive interest of participants and not in the service providers' interest, fiduciaries must negotiate as if their own money was at stake. Instead of simply accepting fees demanded by these conflicted providers.

## ADMINISTRATIVE SERVICES

36.     Plan administrative services are sometimes called recordkeeping services. The recordkeeper keeps track of the amount of each participant's investments in the various options in the plan, and typically provides each participant with a quarterly account statement. The recordkeeper often maintains a plan website or call center that participants can access to obtain information about the plan and to review their accounts. The recordkeeper may also provide access to investment education materials or investment advice. These administrative services are largely commodities, and the market for them is highly competitive.

37.     There are numerous recordkeepers in the marketplace who are capable of providing a high level of service and who will vigorously compete to win a recordkeeping contract for a jumbo retirement plan. These recordkeepers will readily respond to a request for proposal and will tailor their bids based on the desired services (*e.g.*, recordkeeping, website, call center, etc.). In light of the commoditized nature of their services, recordkeepers primarily differentiate themselves based on price, and will aggressively bid to offer the best price in an effort to win the business, particularly for jumbo plans like the Plan here.

38.     The ten largest United States recordkeepers based on total assets under management are: 1. Fidelity ($1.6 trillion); 2. TIAA ($460 billion); 3. Empower Retirement ($443 billion); 4. Vanguard ($437 billion); 5. Voya Financial, Inc. ($311 billion); 6. Wells Fargo ($228 billion); 7. Bank of America Merrill Lynch ($220 billion); 8. Conduent ($195 billion); 9. Principal Financial Group ($164 billion); 10. T. Rowe Price ($156 billion). All of these companies provide similar services and primarily differentiate themselves based on price.

39.     There are two primary methods for 403(b) plans to pay for administrative services: "direct" payments from plan assets, and "indirect" payments by diverting money from plan investments. Plans may use one method or the other exclusively or may use a combination of both direct and indirect payments.

40.     In a typical direct payment arrangement, the plan contracts with a recordkeeper to obtain administrative services in exchange for a flat annual fee

based on the number of participants for which the recordkeeper will be providing services, for example $35 per plan participant per year. Plans with hundreds of millions in assets under management possess tremendous economies of scale for purposes of recordkeeping and administrative fees.

41.     A recordkeeper's cost for providing services depends largely on the number of participants in a plan, not the amount of assets in a plan or in an individual account. The cost of recordkeeping a $300,000 account balance is the same as a $3,000 account. Accordingly, a flat price based on the number of participants in the plan ensures that the amount of recordkeeping compensation is tied to the actual services provided by the recordkeeper and does not grow based on matters that have nothing to do with the services provided, such as an increase in plan assets due to market growth or greater plan contributions by the employee.

42.     For example, a plan with 30,000 participants and $3 billion in assets, may issue a request for proposal to several recordkeepers and request that the respondents provide pricing based on a flat rate for a 30,000 participant plan. If the winning recordkeeper offers to provide the specified services at a flat rate of $30 per participant, per year, the fiduciary would then contract with the recordkeeper for the plan to pay a $900,000 direct annual fee (30,000 participants at $30 per participant). If the plan's assets double and increase to $6 billion during the course of the contract but the participant level stays constant, the recordkeeper's compensation does not double like the plan assets did.

43.     Such a flat per-participant agreement does not necessarily mean, however, that every participant in the plan must pay the same $30 fee from his or her account. The plan could reasonably determine that assessing the same fee to all participants would discourage participants with relatively small accounts from participating in the plan, and that, once the aggregate flat fee for the plan has been determined, a proportional asset-based charge would be best. In that case, the flat per-participant rate of $30 per participant multiplied by the number of participants would simply be converted to an asset-based charge, such that every participant pays the same percentage of his or her account balance. For the $3 billion plan in this example, each participant would pay a direct administrative fee of 0.03% of his or her account balance annually for recordkeeping ($900,000/$3,000,000,000 = 0.0003). If plan assets increase thereafter, the percentage would be adjusted *downward* so that the plan is still paying the same $900,000 price that was negotiated at the plan level for services to be provided to the plan.

44.     Plan administrative service providers offer an array of other fee and expense models. These often include some combination of dollar per head and asset-based approaches. Plaintiff here is specifically not alleging that the University was required to use a direct payment arrangement. Rather, Plaintiff is simply providing details on how direct payment methods operate and provides these details to partially illustrate (together with all the allegations herein) that the fees Plan participants are paying to TIAA are excessive and that the University

should have done more to investigate, monitor, request, negotiate, and secure reasonable administrative fees for Plan participants.

45.     The University uses a method of paying for recordkeeping for the Plan through indirect revenue sharing payments. Revenue sharing, while not a *per se* violation of ERISA, can lead to massively excessive fees if not properly understood, monitored, and capped.

46.     In a revenue sharing arrangement, the amount of compensation for administrative services to the plan is not based on the actual value of such services, instead compensation is based on the amount of assets in the plan, or amount of assets in certain investments in the plan. For example, the recordkeeper will agree to a fee that is tethered to the amount of assets in the Plan. The fees will grow to unreasonable levels if plan assets grow while the number of participants, and thus the services provided, does not increase at a similar rate. By way of example, if a recordkeeper contracts to receive one percent annually of assets in the plan as indirect compensation for a plan with 100 participants and $300,000 in plan assets, the recordkeeper would receive $3,000 per year in fees, or $30 on a per plan participant basis. But if the plan assets increased to $300,000,000 – and the contract remains the same, the recordkeeper receives $3,000,000 per year in fees, or $30,000 on a per plan participant basis. This would be an excessive fee by any measure.

47.     If a fiduciary decides to use revenue sharing to pay for recordkeeping, it is required that the fiduciary (1) determine and monitor the amount of the

revenue sharing and any other sources of compensation that the provider has received, (2) compare that amount to the price that would be available on a flat per-participant basis, or other fee models that are being used in the marketplace, and (3) ensure the plan pays a reasonable amount of fees.

48.     As to the second critical element—determining the price that would be available on a flat per-participant basis, or the price available under other fee models—making that assessment for a hundred million dollar plan requires soliciting bids from competing providers. In plans, such as the Plan here, benchmarking based on fee surveys alone is inadequate. Recordkeeping fees for plans have declined significantly in recent years due to increased technological efficiency, competition, and increased attention to fees by sponsors of other plans such that fees that may have been reasonable at one time may have become excessive based on current market conditions. Accordingly, the only way to determine the true market price at a given time is to obtain competitive bids.

49.     Prudent fiduciaries will also hire industry experts like Mercer Investment Consulting, AonHewitt and Towers Watson to work on their behalf to obtain competitive bids and negotiate fee agreements with recordkeepers. By way of example, California Institute of Technology (CalTech) hired Mercer Investment Consulting to help it renegotiate the administrative fees its retirement plan paid TIAA. CalTech was subsequently successful in securing $15 million in rebates from TIAA.

50.     Industry experts recognize that it is especially important in a university 403(b) context to scrutinize administrative fees and obtain competitive bids for administrative services. Compared to benchmarking, "the RFP is a far better way to negotiate fee and service improvements for higher education organizations." *See* Fiduciary Plan Governance, LLC, *Buying Power for Higher Education Institutions: When you Have It and When You Don't – Part 2.* Indeed, "[c]onducting periodic due diligence RFPs is a critical part of fulfilling the fiduciary duty." Western PA Healthcare News, *403(b) Retirement Plans: Why a Due Diligence Request for Proposal.* Engaging in in this RFP process "allows plan sponsors . . . to meet their fiduciary obligations, provides leverage to renegotiate services and fees; enhances service and investment opportunities and improves overall plan operation." *Id.* Prudent fiduciaries of 403(b) plans should obtain competitive bids for recordkeeping at regular intervals of approximately three years.

## TIAA

51.     TIAA is the recordkeeper for the Plan. It keeps track of the amount of each Plan participant's investments in the various options in the Plan and provides each participant with a quarterly account statement. TIAA maintains a website and call center that participants can access to obtain information about the Plan and to review their accounts. TIAA also provides access to investment education materials or investment advice. The services TIAA provides to the Plan are virtually identical

to the administrative services provided by all of the leading plan administrative service providers.

52.     In the early 1900s, teachers had no access to pensions that would help them live comfortably in retirement. In 1918, the Carnegie Foundation donated $1 million to fund Teachers Insurance and Annuity Association, which is now known as TIAA. Its goal was to "ensure that teachers could retire with dignity."

53.     For decades, TIAA grew by operating as a non-profit organization and providing low-cost retirement services to the nation's universities, colleges, school districts, and other non-profits. Because of its unique and noble heritage, TIAA's reach grew to epic proportions. It today has over $1 trillion dollars of assets under management

54.     TIAA still markets itself as a non-profit organization. That is misleading. In 1997, Congress revoked TIAA's non-profit status because TIAA was competing directly with for profit companies. After TIAA's non-profit status was revoked, TIAA began to impose steep fees on clients and to push its clients into products that do not add value and may not be suitable but generate higher fees for TIAA.

55.     According to several recent articles in The New York Times, TIAA management assigned outsized sales quotas to its representatives and directed them to meet the quotas by playing up customers' fears of not having enough money in retirement and other "pain points." *See e.g., The Finger-Pointing at the Finance Firm TIAA*, Morgenson, Gretchen, New York Times, Oct. 21, 2017. These

allegations are echoed in a whistle-blower complaint filed against the company with the Securities and Exchange Commission. The whistle-blower complaint contends that TIAA began conducting a fraudulent scheme in 2011 to convert "unsuspecting retirement plan clients from low-fee, self-managed accounts to TIAA-CREF-managed accounts" that were more costly. Advisers were pushed to sell proprietary mutual funds to clients as well, the complaint says. The more complex a product, the more an employee earned selling it.

56.     In October 2015, TIAA was sued by its own employees who alleged that TIAA breached its fiduciary duty by charging excessive fees and expenses to participants in TIAA's own employee retirement plan. TIAA settled the lawsuit with a $5 million payment and by reducing its fees by an estimated $2 million per year.

57.     TIAA's executive pay packages also illustrate that TIAA is an aggressive profit-seeking enterprise. The compensation of TIAA's executives is greater than or close to the very highest paid executives of some of Wall Street's largest for-profit investment companies. In 2016, TIAA's CEO received $18.5 million in compensation. TIAA's CEO received more compensation than the CEO of J.P. Morgan Chase, Citigroup, MetLife, and Deutsche Bank among many others. When expressed as a percentage of assets under management, TIAA's CEO had the very highest compensation rate among reporting investment companies. TIAA's five highest-ranking "named executive officers" earned a combined total of well over $40 million in compensation in 2015.

58.     There is no shortage of high quality low,-cost alternatives to TIAA's recordkeeping services for 403(b) plans. Indeed, recently several universities acting as prudent 403(b) fiduciaries have engaged in a comprehensive review of TIAA fees and made substantial changes to their 403(b) plans for the benefit of plan participants.

59.     Loyola Marymount University (LMU) provides a 403(b) plan to its employees. TIAA was a recordkeeper for LMU's plan. LMU hired an independent third party consultant AonHewitt, to issue a request for proposal to seven different 403(b) recordkeeping providers. After receiving responses from the recordkeepers, LMU elected to terminate its recordkeeping contract with TIAA and executed a recordkeeping contract with Diversified Investment Advisors. The process resulted in a reduction of administrative fees totaling several million per year.

60.     Pepperdine University retained an independent third party consultant to assist it in issuing a request for proposal to different 403(b) recordkeeping providers. Following the competitive bidding process, Pepperdine terminated its contract with TIAA and selected Diversified Investment Advisors to be its plan's recordkeeper. A move that saved the plan millions in administrative fees.

61.     Purdue University hired an independent third-party consultant, EnnisKnupp & Associates (n/k/a AonHewitt), to assist its plan in evaluating fees and recordkeeping services. Purdue issued a request for proposal to several

recordkeepers. Following the bidding process, Purdue terminated its recordkeeping contract with TIAA and selected Fidelity to be its recordkeeper. Purdue told participants the change – along with others – would increase participant balances by an estimated $3-4 million per year which is then compounded over time.

62.     The University of Notre Dame also hired EnnisKnupp & Associates (n/k/a AonHewitt), to assist its plan in evaluating fees and recordkeeping services. Notre Dame issued a request for proposal to several recordkeepers. Following the bidding process, Notre Dame terminated its recordkeeping contract with TIAA and selected Fidelity to be its recordkeeper.

63.     Extensive industry literature shows that LMU, Pepperdine, Purdue, and Notre Dame are not outliers, and that similarly situated fiduciaries who have comprehensively reviewed their plans have been able to reduce administrative and recordkeeping fees, leading to enhanced outcomes and retirement security for their plans' participants.

## THE UNIVERSITY BREACHED ITS DUTY OF PRUDENCE

64.     Based on information currently available to Plaintiff regarding the Plan's features, the nature of the administrative services provided by TIAA, the Plan's participant level, and the recordkeeping market, benchmarking data indicates that a reasonable recordkeeping fee for the Plan would have been a fixed amount of about $50,000 per year (approximately $35 per participant with an

account balance). Until recently, TIAA, however, was collecting roughly $600,000 per year (on average approximately $425 per participant).

65.    Under the recordkeeping services agreement between TIAA and Defendant dated June 8, 2006, which was valid through March 20, 2020, TIAA was compensated based on revenue sharing payments from mutual funds and annuity contracts. But the June 8, 2006 agreement does not specify the negotiated fee between Defendant and TIAA for recordkeeping and administrative services. Nor does it provide any cap as to revenue sharing. This allowed TIAA's fees to skyrocket as Plan assets increased.

66.    In April of 2015, TIAA disclosed to the market it was creating two share classes for investments offered by TIAA and included on the Plan's menu of investments. A portion of this disclosure is set forth below.

| Current CREF Accounts | | CREF R2 Accounts as of April 24, 2015 | |
|---|---|---|---|
| CREF Account† | Expense Ratio as of May 1, 2014* | CREF Account with Class Designation | Estimated New Expense Ratio** |
| CREF Stock | 0.455% | CREF Stock R2 | 0.460% |
| CREF Global Equities | 0.465% | CREF Global Equities R2 | 0.480% |
| CREF Growth | 0.415% | CREF Growth R2 | 0.425% |
| CREF Equity Index | 0.391% | CREF Equity Index R2 | 0.395% |
| CREF Bond Market | 0.450% | CREF Bond Market R2 | 0.460% |
| CREF Inflation-Linked Bond | 0.405% | CREF Inflation-Linked Bond R2 | 0.415% |
| CREF Social Choice | 0.405% | CREF Social Choice R2 | 0.430% |
| CREF Money Market | 0.395% | CREF Money Market R2 | 0.410% |

In 2019, the Plan held $20,105,017 in CREF Stock R2. If TIAA received .460 basis point fee (as disclosed by TIAA above) from the Plan *just* for the investment in the CREF Stock R2 then it received $92,690.08 in revenue sharing just from Plan

participants invested in the CREF Stock R2 investment. That equates to $66.20 per participant, per year for all plan participants. And there are roughly 33 other investments offered by the Plan for which TIAA also pockets revenue sharing fees.

67.    Worse still, fees and revenue sharing payments are not actually listed on the June 8, 2006 agreement's Schedule B, despite the requirement in the agreement that such information be provided.

68.    On March 20, 2020 Defendant and TIAA entered into a revised recordkeeping services which, for the first time in about 14 years, included actual recordkeeping services costs, charged as "basis points," which is common practice in the industry. In the revised agreement, TIAA agreed to a soft cap of its revenue sharing fees. The University could have and should have negotiated and secured reduced fees long before just recently in 2020.

69.    The University failed to control recordkeeping costs as Plan assets grew. From 2013 to the present, the Plan's assets increased from about $93,088,299 (in 2013) to about $150,000,000 (in 2019).

70.    Defendant could have capped the amount of revenue sharing to ensure that any excessive amounts were returned to the Plan as other loyally and prudently administered plans do, but failed to do so until just recently. Defendant's failure to cap the amount of revenue sharing cost the Plan and its participants to sustain hundreds of thousands of dollars in losses.

71.    According to information obtained thus far, Defendant failed to engage in a competitive bidding process for a recordkeeper. A competitive bidding

process for the Plan's recordkeeping services should have produced a more reasonable recordkeeping fee for the Plan. This competitive bidding process would have enabled Defendant to select a recordkeeper charging reasonable fees, obtain a substantial reduction in recordkeeping fees, and rebate any excess expenses paid by participants for recordkeeping services.

72.    Considering the level of fees paid by the Plan for recordkeeping, coupled with the documents produced thus far by Defendant in response to Plaintiff's pre-suit request for information, evidence shows that the University failed to engage in a competitive bidding process.

73.    The excessive fees demonstrate that, in contrast to with the 403(b) plan reviews conducted by the universities described above, Defendant here failed to engage in a similar analysis. Defendant did not retain a third party to review administrative fees. Defendant did not act on the information about fees in its possession as a prudent fiduciary would. Defendant did not seek competitive bids for recordkeeping. Had Defendant done so, Defendant would not have allowed the Plan to continue to pay excessive administrative fees. Had Defendant monitored the compensation paid to the Plan's recordkeeper and ensured that participants were only charged reasonable fees for administrative and recordkeeping services, Plan participants would not have lost hundreds of thousands of dollars in their retirement savings over the last six years.

74.    The administrative fees are so extraordinarily high that had Defendant employed a prudent fiduciary process, Defendant could have reduced

the fees without sacrificing any of the services provided to the Plan. Defendant failed to balance fairly the costs of administering the Plan the amount of fees the Plan paid to TIAA for services TIAA actually provided to the Plan. TIAA provides virtually the same services as many other recordkeepers in the marketplace, TIAA's services do not justify the excessive fees paid by the Plan. TIAA's fee is so disproportionately large that it bears no reasonable relationship to the services rendered.

75.     Annual Returns on Form 5500 provide additional evidence of Defendant's failure to act prudently on behalf of the Plan. The Plan's 5500's are essentially the Plan's annual tax returns. Department of Labor ("DOL") rules expressly require that plan services providers report all direct and indirect compensation received for the year in connection with those services.

76.     In a 2012 TIAA publication entitled "Plan Sponsor Service and Fee Disclosure Guide," TIAA explained to its plan sponsor customers that recent changes to the annual reporting obligations for employee benefit plans on Schedule C of Form 5500 required enhanced reporting to the help fiduciaries review plan fees and expenses as a part of their ongoing obligation to monitor their service provider arrangements."

77.     But not a single annual report filed with the Department of Labor on Form 5500 since 2013 for the Plan includes any disclosures of the amount of indirect compensation being received by TIAA from the Plan for administrative services.

78.     In fact, all of the 5500's for the Plan affirmatively indicate that recordkeeper received indirect compensation for recordkeeping services but in a contradiction state the amount received is "$0". This is patently false.

79.     Below is an example from Defendant's 2019 5500 filed with the DOL:

TIAA

13-1624203

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 15 17 27 28 38 50 52 54 64 66 | NONE | 521 | Yes [X]  No [ ] | Yes [X]  No [ ] | 0 | Yes [ ]  No [X] |

80.     All of the Defendant's 5500's for the Plan dating back to 2013 show the same "$0" amount in indirect compensation being paid to TIAA-CREF.

81.     Clearly, Defendant is not paying "$0" in indirect compensation to TIAA-CREF.  In fact, upon information and belief, it is likely overpaying hundreds of thousands (if not millions) to TIAA-CREF much to the determinant of the Plan and its participants and beneficiaries. .

82.     Based on these above facts, Defendant permitted the Plan to Pay excessive administrative and recordkeeping fees in violation of ERISA.

## ERISA'S FIDUCIARY STANDARDS

83.     ERISA imposes strict fiduciary duties of loyalty and prudence upon

the Defendant as fiduciary of the Plan. 29 U.S.C. §1104(a)(1), states, in relevant

part, that:

> [A] fiduciary shall discharge his duties with respect to a plan
> solely in the interest of the participants and beneficiaries and –
>
> > (A)  for the exclusive purpose of:
> >
> > > (i)  providing benefits to participants and their
> > > beneficiaries; and
> > > (ii) defraying reasonable expenses of administering
> > > the plan; [and]
> >
> > (B) with the care, skill, prudence, and diligence under the
> > circumstances then prevailing that a prudent man acting
> > in a like capacity and familiar with such matters would
> > use in the conduct of an enterprise of like character and
> > with like aims.

84.     Under 29 U.S.C. §1103(c)(1), with certain exceptions not relevant

here,  the assets of a plan shall never inure to the benefit of any employer and shall

be held for the exclusive purposes of providing benefits to participants in the plan

and their beneficiaries and defraying reasonable expenses of administering the

plan.

85.     Under ERISA, fiduciaries that exercise any authority or control over

plan assets, including the selection of plan investments and service providers, must

act prudently and solely in the interest of participants in the plan.

86.     ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries.

29 U.S.C. §1105(a) provides a cause of action against a fiduciary for knowingly

participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. The statute states, in relevant part, that:

> In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> > (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; [or]
> >
> > (2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
> >
> > (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

87.     29 U.S.C. §1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under 29 U.S.C. §1109. Section 1109(a) provides in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

## CLASS ACTION ALLEGATIONS

88.    29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of either of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. §1109(a).

89.    In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. §1132(a)(2) and (3), Plaintiff seeks to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiff seeks to certify, and to be appointed as representatives of, the following class:

> All participants and beneficiaries of the University of Tampa Retirement and Savings Plan from April 25, 2015, through the date of judgment, excluding the Defendant or any participant who is a fiduciary to the Plan, excluding those individuals serving or who have served in a fiduciary capacity to the Plan, and the members of their immediate families.

90.    This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

a.    The Class includes over 1,000 members and is so large that joinder of all its members is impracticable.

b.    There are questions of law and fact common to this Class because the Defendant owed fiduciary duties to the Plan and to all participants and beneficiaries and took the actions and omissions alleged herein as to the Plan and not as to any individual participant.

Thus, common questions of law and fact include the following, without limitation: who are the fiduciaries liable for the remedies provided by 29 U.S.C. §1109(a); whether the fiduciaries of the Plan breached their fiduciary duties to the Plan; what are the losses to the Plan resulting from each breach of fiduciary duty; and what Plan-wide equitable and other relief the court should impose in light of Defendant's breach of duty.

c.     Plaintiff's claims are typical of the claims of the Class because Plaintiff was a participant during the time period at issue in this action and all participants in the Plan were harmed by Defendant's misconduct.

d.     Plaintiff is an adequate representative of the Class because he is/was a participant in the Plan during the Class period, has no interests that are in conflict with the Class, and is committed to the vigorous representation of the Class, and has engaged experienced and competent attorneys to represent the Class.

e.     Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendant in respect to the discharge of its fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. §1109(a), and (B) adjudications by

individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

91.     A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiff is aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

92.     Plaintiff's counsel will fairly and adequately represent the interests of the Class and is best able to represent the interests of the Class under Rule 23(g).

<u>COUNT I</u>
**ERISA Breach of Duty Prudence—Excessive and Unreasonable Fees**

93.     Plaintiff restates and incorporates the allegations contained in the preceding paragraphs.

94.     ERISA § 404(a)(1) imposes twin duties of prudence and loyalty on fiduciaries of retirement plans. The duty of prudence, codified in ERISA § 404(a)(1)(B), requires a pension plan fiduciary to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." ERISA § 404(a)(1)(B).

95.     Defendant breached its duty of prudence with regard to TIAA's excessive administrative fees. The breach arose from the following actions and inactions: (1) failing to solicit competitive bids from other recordkeepers; (2) failing to monitor and control administrative fees by not (a) monitoring the amount of TIAA's administrative fees; (b) determining the competitiveness/reasonability of the fees; or (c) leveraging the Plan's size to reduce fees.

96.     Defendant failed to engage in a prudent process for the evaluation and monitoring of amounts being charged for administrative expense, allowing the Plans to be charged an asset-based fee for recordkeeping calculated in a manner that was completely inconsistent with a reasonable fee for the service and was grossly excessive for the service being provided.

97.     Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plans resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

## PRAYER FOR RELIEF

***WHEREFORE***, Plaintiff, on behalf of the Plan and all similarly situated participants and beneficiaries, respectfully requests that the Court:

1.     Find and declare that the Defendant has breached its fiduciary duties as described above;

2.     Find and adjudge that Defendant is personally liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duties, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

3.     Determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

4.     Order Defendant to provide all accountings necessary to determine the amounts Defendant must make good to the Plan under §1109(a);

5.     Remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

6.      Surcharge against Defendant and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

7.      Reform the Plan to obtain bids for recordkeeping and to pay only reasonable recordkeeping expenses;

8.      Certify the Class, appoint the Plaintiff as class representative, and appoint his counsel as Class Counsel;

10.      Award to the Plaintiff and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

11.      Order the payment of interest to the extent it is allowed by law; and

12.      Grant other equitable or remedial relief as the Court deems appropriate.

DATED this 28th day of April 2021.

Respectfully submitted,

**BRANDON J. HILL**
Florida Bar Number: 37061
**LUIS A. CABASSA, P.A.**
Florida Bar Number: 0053643
**WENZEL FENTON CABASSA, P.A.**
1110 North Florida Ave., Suite 300
Tampa, Florida 33602
Direct: 813-337-7992
Main: 813-224-0431
Facsimile: 813-229-8712
Email: bhill@wfclaw.com
Email: lcabassa@wfclaw.com
Email: gnichols@wfclaw.com

Michael C. McKay (*pro hac vice
application forthcoming*)
5635 N. Scottsdale Road, Suite 170
Scottsdale, Arizona 85250
Telephone: (480) 681-7000
Email: mckay@mckay.law